**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| PENNY DOMBECK, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF JEFFREY DOMBECK, DECEASED<br><br>PLAINTIFF,<br><br>vs.<br><br>MERCK & CO., INC.<br><br>DEFENDANT. | Case No.: 9:26cv81017<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S ORIGINAL COMPLAINT**

# TABLE OF CONTENTS

I. PARTIES ........................................ 1

II. JURISDICTION AND VENUE ........................................ 1

III. FACTS ........................................ 2

A. Overview of the Case ........................................ 2

B. The Plaintiff ........................................ 4

C. Laws Governing the Approval and Labeling of Prescription Drugs ........................................ 4

D. New Safety Information ........................................ 7

(i) Undisclosed Cases of Myasthenia Gravis, Myositis, Myocarditis, AKI, and Related Deaths in Keytruda Clinical Trials ........................................ 8

(ii) Undisclosed Scientific Literature and Keytruda's High Risk of Myasthenia Gravis, Myositis, Myocarditis, and AKI........................................12

(iii) Increased Risk in Subpopulations: Elderly, Pre-Existing Autoimmune Conditions, and Pre-Existing Cardiac Disease ........................................24

(a) Increased Risk of Myastenia Gravis, Myositis and Myocarditis in the Elderly ........................................24

(b) Increased Risk of Myastenia Gravis, Myositis and Myocarditis in Patients with Underlying Autoimmune Disease ........................................28

(c) Increased Risk of of Myastenia Gravis, Myositis and Myocarditis in Patients with Underlying Cardiac Diseases ........................................31

(d) Increased Risk of Keytruda-Induced AKI and Renal Failure ........................................33

(iv) Keytruda Lacks Efficacy for Adjuvant and Neoadjuvant Use ........................................ 36

(v) Increase in Adverse Events and Undisclosed Safety Signal Analysis ........................................ 39

(vi) Merck Changed the Keytruda Label to Warn for MMM after Mr. Dombeck's Death........................................42

E. Mr. Dombeck's Prescribing Physician Relied on Defendant's Misleading Safety Information ........................................ 42

IV. CAUSES OF ACTION ........................................ 45

COUNT I - STRICT PRODUCTS LIABILITY/FAILURE TO WARN ..................................... 45

COUNT II - NEGLIGENCE ........................................................................................... 46

DEMAND FOR JURY TRIAL ..........................................................................................49

REQUEST FOR RELIEF ............................................................................................... 49

Plaintiff Penny Dombeck, individually, and as representative of the estate of her deceased husband, Jeffrey Dombeck (referred to collectively in those dual capacities as "Plaintiff") files this Original Complaint against Merck & Co., Inc. ("Defendant").

## I. PARTIES

1. Plaintiff is a resident and citizen of Palm Beach County, Florida.

2. Decedent Jeffrey Dombeck was a resident of Palm Beach County, Florida at the time he died.

3. Defendant is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889. It may be served with process through its registered agent CT Corporation System at its registered office street address 820 Bear Tavern Road, West Trenton, New Jersey 08628.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000. The Court has jurisdiction over Defendant because it engaged in business in this Judicial District and the State of Florida in connection with the transactions and occurrences giving rise to this action, including but not limited to advertising, promoting, selling and distributing Keytruda in this Judicial District, and because the wrongful conduct alleged herein was directed at, took place in, and/or had foreseeable injurious effects in this Judicial District and the State of Florida. The Court also has jurisdiction over Defendant because it has continuously and systematically engaged in business in this Judicial District and the State of Florida such that it has subjected itself to personal jurisdiction in this Court for all purposes.

5. Venue is proper pursuant to 28 U.S.C. §1391(b)(2) and (c)(1) because Plaintiff's

claims arose from events taking place within this Judicial District, and because Plaintiff resides in and was injured in this District.

## III. FACTS

### A. Overview of the Case

6. This is a prescription drug failure to warn and wrongful death case. Mr. Dombeck was an active 77-year-old Florida resident with non-terminal melanoma when he suffered fatal myasthenia gravis, myositis, myocarditis (collectively, "MMM") and acute kidney injury ("AKI") reactions from Defendant's blockbuster cancer medication, Keytruda.

7. Mr. Dombeck's injuries and death resulted from Defendant's profit-driven decision to exclude critical safety warnings from the U.S. Keytruda product label. Specifically, Defendant's label i) does not contain a complete and accurate disclosure of the cases of myasthenia gravis, myositis, myocarditis, AKI and the deaths related to those conditions in Keytruda clinical trials; ii) vastly understates the risk of myasthenia gravis, myositis, myocarditis, AKI and death related to those conditions; and iii) does not warn for Keytruda's increased risk of harm from these adverse drug reactions to Mr. Dombeck's elderly, pre-existing auto-immune and cardiac disease subpopulations. These categories of missing warnings that Merck could and should have added to the U.S. Keytruda label before Mr. Dombeck's treatment are collectively referred to in this Complaint as the "Dombeck Warnings."

8. "There is an inherent tension between the desire for profit and scientific decisions that suggest warnings may well shrink the customer base because of the cautionary tone struck by the warnings."[1] That tension is evident here. Keytruda is Defendant's flagship U.S. patent-protected cancer therapy product. It is the most heavily marketed and profitable drug in

[1] *Hodges v. Pfizer, Inc.*, No. 14-cv-4855, 2016 WL 1222229, at *3 (D. Minn. Mar. 28, 2016).

Defendant's history. The calculated result of Defendant's decision not to disclose critical safety information in the U.S. Keytruda label is that the label overpromotes the drug's safety profile, resulting in more physicians prescribing the drug, more consumers requesting and using the drug, and more money in Defendant's pocket. As a direct result of its unprecedented direct-to-consumer and prescribing physician advertising campaigns, Keytruda was the world's best-selling drug in 2023 and 2024, grossing over $50 billion in global sales in those two years alone.

9. A substantial portion of Defendant's Keytruda marketing spend targeted the elderly such as Mr. Dombeck – and that targeted marketing strategy worked. The use of Keytruda in the elderly exploded, with the majority of users occupying the same elderly subpopulation as Mr. Dombeck. The increased risk of MMM and AKI from Keytruda – which is exacerbated for elderly patients such as Mr. Dombeck – is a serious health concern. It is the type of risk that a reasonably prudent drug company should prominently warn for in its drug label. Defendant has the historical scientific knowledge, financial resources, and internal safety processes and procedures in place to warn about the very risks that caused Mr. Dombeck's death.

10. Defendant's marketing initiatives focused on images of attractive, fit and healthy elderly cancer patients. Noticeably absent from these ads was any appreciable disclosure of the increased risk of injury or death from myasthenia gravis, myositis, myocarditis, and AKI or the increased risk of these adverse drug reactions in Mr. Dombeck's subpopulations. Even though Mr. Dombeck's high risk subpopulations comprised a substantial part of its target market, Defendant's Keytruda advertising campaign failed to disclose the risks to these vulnerable people or their prescribing physicians. Unfortunately, Defendant's aggressive and misleading Keytruda marketing campaign had catastrophic repercussions for those at-risk U.S. consumers and their families, including Plaintiff.

**B. The Plaintiff**

11. Jeffrey Dombeck was a 77-year-old male who was diagnosed in June 2024 with non-terminal melanoma. Mr. Dombeck's prescribing physician, Dr. Jose Lutzky, prescribed a treatment plan of 3 neoadjuvant cycles of Keytruda (pembrolizumab), followed by surgery, and an additional 15 cycles of adjuvant Keytruda to complete one year after surgery. Mr. Dombeck's past medical history was significant for coronary artery disease and stent placement years prior to being diagnosed with melanoma and the autoimmune/rheumatological disorder Meniere's disease.

12. On August 6, 2024, Mr. Dombeck received his first Keytruda infusion. Approximately two weeks later, on August 24, 2024, he presented to Bethesda Hospital West where he was diagnosed with immune mediated myositis, myocarditis, and myasthenia gravis from Keytruda. Mr. Dombeck underwent pacemaker implantation surgery on August 26, 2024, and was transferred to a higher level of care at the University of Miami on August 31, 2024.

13. On September 4, 2024, Mr. Dombeck was transferred to the ICU where he was intubated and placed on mechanical ventilation. He was diagnosed with MMM with complete heart block, stage 3 acute kidney injury, acute rhabdomyolysis, respiratory failure, and dysphagia due to Keytruda.

14. Mr. Dombeck died on September 20, 2024, after his family watched him deteriorate and suffer for weeks before they made the painful decision at the recommendation of treating physicians to transition him to comfort care. The cause of death on Mr. Dombeck's death certificate listed Keytruda-immune therapy induced MMM.

**C. Laws Governing the Approval and Labeling of Prescription Drugs**

15. The facts and allegations set forth above must be viewed through the regulatory framework and heightened duties of care imposed on prescription drug and biologic

manufacturers.[2] The Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act") requires manufacturers that develop a new medicine to file a Biologics License Application ("BLA") or New Drug Application ("NDA"), as applicable, in order to obtain approval from the Food and Drug Administration ("FDA") before selling the product in interstate commerce. 21 U.S.C. §355.

16. An NDA or BLA is the formal step a drug or biologic sponsor takes to request that the FDA consider approving a new drug for marketing in the United States. 21 C.F.R §314.55 (drugs); 21 C.F.R. § 601.2 (biologics). An NDA or BLA should include all animal and human data and analyses of the data, as well as information about how the medicine behaves (pharmacokinetics and pharmacodynamics) in the body and how it is manufactured. 21 C.F.R §314.50 (drugs); 21 C.F.R. § 601.2 (biologics). A key component of the new drug approval process is the evaluation of the information regarding the safety and efficacy of the proposed drug. *Id.* Thus, the NDA or BLA must contain a section reporting on foreign or domestic clinical data regarding the proposed new drug. 21 C.F.R §314.50(d)(5) (drugs); 21 C.F.R. § 601.12(2)(a) (biologics).

17. Manufacturers with an approved NDA or BLA must review all adverse drug experience information obtained by or otherwise received by them from any source, including but not limited to post-marketing experience, reports in the scientific literature, and unpublished scientific papers. 21 C.F.R. §314.80(b) (drugs); 21 C.F.R. § 600.80 (biologics).

18. Under what is known as the Changes Being Effected ("CBE") regulation, a manufacturer with an approved NDA or BLA can make certain changes to its label without prior FDA approval by simply sending the FDA a "supplemental submission." 21 C.F.R.

---

[2] Keytruda is a biologic approved through a Biologics License Application. The federal regulations for biologics and prescription drugs permit a manufacturer to add or strengthen certain safety warnings without prior FDA approval when supported by newly acquired information. 21 C.F.R. § 601.12(f)(2) (biologics); 21 C.F.R. § 314.70(c)(6) (drugs). The relevant labeling principles for biologics and drugs are the same for purposes of Plaintiff's claims.

§314.70(c)(6)(iii) (drugs); 21 C.F.R. § 601.12(f)(2) (biologics).

19. Labeling changes a manufacturer can make pursuant to CBE and without prior FDA approval include those to "add or strengthen a contraindication, warning, precaution, or adverse reactions for which the evidence of causal association satisfies the standard for inclusion in the labeling" and "to add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product." 21 C.F.R. §314.70(c)(6)(iii)(A) and (C) (drugs); 21 C.F.R. § 601.12(f)(2)(i)(A) and (C) (biologics).

20. A manufacturer must revise its label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitively established." 21 C.F.R. §201.57(c)(6). Adverse reactions must be added to the label where there "is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id.* at § 201.57(c)(7). An August 22, 2008, amendment to these regulations provides that a CBE supplement to amend the labeling for an approved product must reflect "newly acquired information." 73 Fed. Reg. 49609. "Newly acquired information" is not limited to new data but also includes "new analysis of previously submitted data." "[I]f a sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.'" *Id.* at 49607.

21. The purpose of the post-marketing efforts and the NDA and BLA submissions that are required throughout the marketing life of a drug or biologic product is to constantly ensure that the benefit of the medicine outweighs the risk. 21 C.F.R. §§314.50, 314.80, and 314.8121 (drugs); 21 C.F.R. §§ 600.80, 601.12, 601.44, and 601.70 (biologics). If new safety information, including

information from clinical trials, foreign countries or other information not previously considered by the FDA, comes to light that calls that balance into question, the FDA requires sponsors such as Defendant to initiate risk management strategies to address the safety risk, including updating the professional label.[3]

**D. New Safety Information**

22. Following FDA approval of Keytruda in September 2014, new safety information emerged that should have prompted Defendant to unilaterally change the Keytruda label – pursuant to the CBE process and without prior FDA approval – to include the Dombeck Warnings and other new safety information identified in this Complaint. Defendant failed to disclose and failed to fully disclose the safety information below to the FDA and U.S. prescribing physicians.[4]

23. Further, Merck has never submitted a CBE supplement proposing the Dombeck Warnings, and the FDA has never issued a final agency decision rejecting the Plaintiff's proposed warnings. Defendant's recent FDA-approved MMM Keytruda label change confirms the material gap in the pre-August 2024 label.

24. Specifically, in May 2026, the FDA approved adding a specific warning for "Myocarditis-Myositis-Myasthenia Gravis (or Myasthenia-Like) Overlap Syndrome," – *the previously unlabeled condition that killed Mr. Dombeck* – to the Keytruda label.

25. Plaintiff's warning allegations do not rely solely on the May 2026 label change. Rather, the recent label change further illustrates the deficiency of Merck's pre-treatment label.

---

[3] The requirement to actively assess safety data and to update the product label is also set forth in 21 C.F.R. §201.56 and 21 C.F.R. §1.21.

[4] While Plaintiff anticipates that Defendant will argue it disclosed "some" of the safety information in this Complaint to the FDA, Defendant is required to (but did not) disclose all of the newly acquired safety information in the Complaint. Further, even as to the articles Defendant may claim it submitted to the FDA, Plaintiff alleges that Defendant failed to i) fully inform the FDA through complete safety submissions accurately reporting the safety risks of its drug, ii) prove that the FDA considered the safety information, and iii) establish the FDA would have rejected a stronger warning had Defendant proposed one to the Agency.

### (i) Undisclosed Cases of Myasthenia Gravis, Myositis, Myocarditis, AKI, and Related Deaths in Keytruda Clinical Trials

26. Defendant knows that it is critically important to disclose all serious adverse events occurring in its clinical trials. The FDA also requires Defendant to regularly review and update the Keytruda label to identify new safety information arising from clinical trials and studies:

> Applicants are urged to review at least annually the content of the adverse reactions section [of the label] to ensure that the information remains current. We expect the labeling to be consistent with newly acquired information from controlled clinical trials or spontaneous reports and with the evolution of labeling in the pertinent drug class. . . The applicant must update the labeling when new information becomes available that causes the labeling to become inaccurate, false, or misleading.[5]

27. Even a single case of myasthenia gravis, myositis, myocarditis, or AKI – and any death from such conditions – occurring in a clinical trial is a significant safety event that requires drug manufacturers such as Defendant to take immediate action to provide new safety information to prescribers; to undertake extensive safety signal analysis and surveillance; and to update their Investigational Brochures and labeling. As discussed in the articles below, Defendant repeatedly ignored cases of MMM, AKI, and deaths from these adverse events in its own clinical trials; and failed to properly disclose the full extent of those cases in its Keytruda labeling and to the FDA, including but not limited to disclosing these adverse events as expedited Suspected Unexpected Serious Adverse Reactions (SUSARs).

28. For rare, serious, and potentially fatal immune-mediated toxicities, well-documented clinical trial cases—particularly repeated cases, fatal cases, and medically assessed cases occurring across Keytruda trials—are significant safety information. By the time of Mr. Dombeck's treatment, Merck had clinical trial cases, fatal cases, published literature, class-

---

[5] FDA Guidance for Industry (CDER): Adverse Reactions Section of the Labeling for Human Prescription Drug and Biological Products (January 2006); Shisman, et al., "New FDA Regulation to Improve Safety Reporting in Clinical Trials," N Engl J Med 365;1 (2011) (commenting that even a single case of a rare and unexpected adverse event in a clinical trial can substantially alter the safety profile of a drug).

consistent biologic plausibility, pharmacovigilance data, and internal safety signal information showing a causal association and an increased risk of the exact Keytruda-related injuries suffered by Mr. Dombeck.

29. Multiple scientific papers and studies have been published on the increased risk of the Keytruda-related harms at issue in this case. In 2012, Braumer, et al.[6] described one case of pembrolizumab-induced myasthenia gravis (MG) that was first described in a phase 1 trial assessing escalating doses of pembrolizumab in 207 patients. The incidence/frequency of MG associated with pembrolizumab from this trial is 1 per 207.

30. In 2015, Robert, et al.[7] reported on the preliminary results from KEYNOTE-006, which was a Phase 3 Randomized controlled trials (RCTs) studying pembrolizumab versus ipilimumab in advanced melanoma. The authors reported 2 cases of myositis associated with pembrolizumab out of 277 (0.7%).

31. In 2016, eight years before Mr. Dombeck's death from Keytruda, Badros, et al.[8] reported on their results from a phase II study of pembrolizumab in combination with pomalidomide and dexamethasone for relapsed/refractory multiple myeloma (RRMM) in which one case of fatal pembrolizumab-induced myocarditis was reported.

32. In 2017, seven years before Mr. Dombeck's death from Keytruda, Chen, et al.[9] reported on their findings from their Merck-sponsored study KEYNOTE-087, which was a single-arm phase II study of pembrolizumab in three cohorts of patients with Hodgkins Lymphoma. The

[6] Brahmer, JR, et al. Safety and Activity of Anti–PD-L1 Antibody in Patients with Advanced Cancer. *N Engl J Med.* 2012 June 28; 366(26): 2455–2465.
[7] Robert, C et al. Pembrolizumab versus Ipilimumab in Advanced Melanoma. *NEJM* June 25, 2015; 372;26: 2521-2532.
[8] Badros, A, et al. Pembrolizumab in Combination with Pomalidomide and Dexamethasone for Relapsed/Refractory Multiple Myeloma. *RRMM Blood* (2016) 128 (22) : 490.
[9] Chen R, et al. Phase II study of the efficacy and safety of pembrolizumab for relapsed/refractory classic Hodgkin lymphoma. *J Clin Oncol: Off J Am Soc Clin Oncol* 2017;35(19):2125e32.

authors reported additional cases of treatment-related adverse events (TRAEs), including cases of pembrolizumab-induced myocarditis and myositis.

33. Also in 2017, Balar, et al.[10] reported on the Merck-sponsored study KEYNOTE-052, which was a phase II study of pembrolizumab in cisplatin-ineligible patients with advanced urothelial cancer. The authors noted a patient's death that was attributed to a treatment-related adverse event (grade 5 myositis) and who suffered several additional serious treatment-related adverse events, including grade 4 myocarditis.

34. Also in 2017, Cho, et al.[11] reported on the results from their Merck-sponsored phase II study of pembrolizumab in patients with previously treated advanced thymic epithelial tumor (NCT02607631). Treatment-related adverse events ≥ grade 3 associated with immune related adverse events (irAEs) included myocarditis (9.1%) and myasthenia gravis (6.1%). The authors reported a much higher incidence of myocarditis and myasthenia gravis compared to other published Merck studies. Because of this new safety information, the authors warned that "given the relatively high incidence of irAEs, early detection and management of autoimmune toxicity is essential to ensure feasibility of pembrolizumab treatment in patients with TET."

35. Also in 2017, Schachter, et al.[12] reported on their findings from the Merck Sponsored Study KEYNOTE 006 using pembrolizumab for advanced melanoma conducted between September 18, 2013, and March 3, 2014. In that trial, Defendant had multiple cases of myositis that were buried in the supplementary study materials with an incidence greater than 1%.

---

[10] Balar, et al. First-line pembrolizumab in cisplatin-ineligible patients with locally advanced and unresectable or metastatic urothelial cancer (KEYNOTE-052): a multicentre, single-arm, phase 2 study. *Lancet Oncol* 2017; 18: 1483–92.
[11] Cho, et al. A phase II study of pembrolizumab for patients with previously treated advanced thymic epithelial tumor. *Journal of Clinical Oncology* 35(15) suppl May 30, 2017--Meeting Abstract: 2017 ASCO Annual Meeting.
[12] Schachter J, et al. Pembrolizumab versus ipilimumab for advanced melanoma: final overall survival results of a multicenter, randomized, open-label phase 3 study (KEYNOTE-006). *Lancet* (London, England) 2017;390(10105):1853e62.

36. In 2018, Giaccone, et al.[13] reported on their results from Merck's single arm Phase 2 study of pembrolizumab in patients with recurrent thymic carcinoma. Two of the authors were Merck employees. Two patients developed treatment-related concurrent myositis and myocarditis after only two cycles of pembrolizumab. Both patients required very high-dose steroids and pacemaker implantation, closely paralleling Mr. Dombeck's Keytruda-induced myocarditis, complete heart block, and pacemaker placement. A third patient developed severe treatment-related myositis requiring steroids.

37. Also in 2018, Eggermont, et al.[14] reported on their results from KEYNOTE-054 (MK-3475-054/1325-MG), a Phase III randomized controlled trial of pembrolizumab for Stage III melanoma. The study reported one treatment-related death from pembrolizumab-induced myositis. The same study also reported other serious pembrolizumab-related adverse events, including myocarditis, myositis, myasthenia gravis, and AKI.[15]

38. In 2019, Rini, et al.[16] published results from the Merck-sponsored study KEYNOTE 426, which was an open-label phase 3 trial that randomly assigned 861 patients with previously untreated advanced clear cell renal cell carcinoma (ccRCC) to receive pembrolizumab (200 mg) intravenously once every 3 weeks plus axitinib (5 mg) orally twice daily (432 patients) or sunitinib (50 mg) orally once daily for the first 4 weeks of each 6-week cycle (429 patients). The authors noted that 11 patients (2.6%) in the pembrolizumab–axitinib group died from adverse events, and four (0.9%) died from TRAEs (from myasthenia gravis, myocarditis, necrotizing

[13] Giaccone, G, et al. Pembrolizumab in patients with thymic carcinoma: a single-arm, single-centre, phase 2 study. *Lancet Oncol*. 2018 March; 19(3): 347–355.
[14] Eggermont, A, et al. Adjuvant Pembrolizumab versus Placebo in Resected Stage III Melanoma. *N Engl J Med* 2018;378:1789-801.
[15] https://clinicaltrials.gov/study/NCT02362594?tab=results.
[16] Rini BI, et al. Pembrolizumab Plus Axitinib Versus Sunitinib for Advanced Renal-Cell Carcinoma. *N Engl J Med* (2019) 380:1116–27.

fasciitis, and pneumonitis). In supplementary study materials, the authors noted four additional reports of myasthenic syndrome, four cases of myositis, and two cases of myocarditis

39. In 2020, Schmid, et al.[17] published their second interim results from Merck's KEYNOTE -522, which was a Phase III RCT using pembrolizumab in early triple negative breast cancer. During the neoadjuvant phase, the study reported three cases of treatment-related myocarditis, two of them severe, and three cases of pembrolizumab-related myositis. During the adjuvant phase, the study reported two cases of myocarditis, one severe, one severe case of myasthenia gravis, and one case of myositis. The occurrence of multiple cases of myocarditis, myasthenia gravis, and myositis—potentially fatal immune-mediated reactions—in a single pembrolizumab trial was a significant safety signal.

40. In 2022, Merck's same investigators[18] reported eight additional cases of pembrolizumab-related acute kidney injury from the same study in the supplementary appendix.

41. Defendant should have but did not disclose these and other Keytruda clinical trial cases of MMM, AKI, and the deaths from these conditions to the FDA and U.S. prescribing physicians.

**(ii) Undisclosed Scientific Literature and Keytruda's High Risk of Myasthenia Gravis, Myositis, Myocarditis, and AKI**

42. After the FDA approved Keytruda in September 2014, several additional scientific studies identified an increased risk of myasthenia gravis, myositis, myocarditis, AKI and deaths from these conditions due to Keytruda use. The scientific literature also found that Keytruda carries a higher risk of these adverse drug events compared to the other immune checkpoint inhibitors

[17] Schmid, P, et al. Pembrolizumab for Early Triple-Negative Breast Cancer. N Engl J Med 2020; 382:810-21.
[18] Schmid P, Cortes J, Dent R, et al. Event-free survival with pembrolizumab in early triple-negative breast cancer. N Engl J Med 2022;386:556-67.

(ICIs) in its class.

43. In 2018, six years before Mr. Dombeck's death from Keytruda, Mir, et al.[19] conducted a systematic review of all published articles and grey literature in PubMed, Medline, and Embase on cardiac complications associated with ICI use from September 1, 1996, to November 10, 2017. Their analysis found 25 published reports (25% of all ICIs) of cardiotoxicity associated with pembrolizumab. At least 64% of the cases from pembrolizumab were myocarditis with a mortality rate of 16-20%.

44. In 2019, Safa, et al.[20] reviewed their institutional databases at MD Anderson Cancer Center in Houston for reports of MG associated with ICI therapy in their patients and also conducted a systematic review of the literature regarding the comparative risks among immune checkpoint inhibitors induced myasthenia gravis. They searched the institutional databases to identify cancer patients who received at least one dose of an FDA-approved ICI (ipilimumab, nivolumab, pembrolizumab, atezolizumab, durvalumab, or avelumab) between January 2011 and December 2018.

45. The authors reported that there was a higher incidence of cases of myasthenia gravis from pembrolizumab leading to fatalities compared to nivolumab in the published literature. Cardiac complications occurred in more than 42% of patients diagnosed with myasthenia gravis or myositis. Mortality from ICI-induced MG was found to be high despite adequate treatment strategies, including corticosteroid, IV immunoglobulins, and plasma exchange. Additionally, the mortality rate associated with ICI-induced MG was 38%, with

[19] Mir, et al. Systematic Review/Meta-analysis of Cardiac Complications Associated With Checkpoint Inhibition: A Systematic Review of the Literature in an Important Emerging Area. *Canadian Journal of Cardiology* 2018; 34:1059-1068.

[20] Safa, H, et al. Immune checkpoint inhibitor related myasthenia gravis: single center experience and systematic review of the literature. *Journal for ImmunoTherapy of Cancer* (2019) 7:319:1-11.

pembrolizumab leading to more deaths than the other ICI drugs.

46. In 2019, Moriera, et al.[21] conducted the largest case series to date describing neuromuscular side effects induced by various ICIs. The authors' analysis revealed that among ICIs, pembrolizumab was the leading cause of serious myositis, myocarditis and myasthenia gravis with the highest mortality rate of 50%. The authors found that immune-related side effects typically preceded the neuromuscular symptoms. The authors also noted that there was a new desire by the medical oncology community to develop MMM case definitions due to the rise of the overlapping serious adverse events in patients exposed to ICIs, including pembrolizumab. The authors recommended additional warnings about the risks of neuromuscular effects from ICIs, including pembrolizumab, because neuromuscular side effects and myocarditis usually start with a mild presentation that can lead to death, thus warranting early detection and intervention by medical specialists.

47. In 2019, Johansen, et al.[22] noted that case reports of myasthenia gravis and myositis associated with pembrolizumab and nivolumab had steadily increased, prompting a systematic review of published literature through June 2018 to better characterize neuromuscular adverse events associated with these two anti-PD-1 drugs. Among pembrolizumab-exposed patients, the authors identified 13 cases of pembrolizumab-induced myasthenia gravis (33%), and 14 cases of pembrolizumab-induced myositis (36%). Three patients developed pembrolizumab-induced MMM, and the authors noted that a substantial percentage of patients who suffered MMM died.

---

[21] Moriera, A, et al. Myositis and neuromuscular side-effects induced by ICIs. *European Journal of Cancer* 106 (2019) 12e23.

[22] Johansen, A, et al. Neuromuscular adverse events associated with anti-PD-1 monoclonal antibodies: Systematic review. *Neurology* 2019; 92:663-674.

48. In 2020, Takai, M, et al.[23] reported on a case of simultaneous pembrolizumab-induced myasthenia gravis and myocarditis in which the patient sustained cardiac arrest and died. The authors noted that at least 12 additional published case reports of concurrent pembrolizumab-induced myasthenia gravis and myocarditis had been reported by that time.

49. Also, in 2020, Petitjean, et al.[24] reported on nine fatal cases of pembrolizumab-induced concurrent myositis and myocarditis. Autopsies in eight of those cases confirmed pembrolizumab-induced myositis and myocarditis as the cause of death.

50. In 2021, Hajihossainlou, et al.[25] reported a case of new onset pembrolizumab-induced myasthenia gravis in an elderly patient and analyzed other published cases of ICI-associated myasthenia gravis. The authors compared new onset myasthenia gravis after ICI therapy with cases involving worsening of pre-existing myasthenia gravis after ICI exposure. In their literature review, the authors identified 36 reported cases of new onset myasthenia gravis after PD-1 inhibitor therapy, including 15 cases associated with pembrolizumab and 21 cases associated with nivolumab. The authors found that severe respiratory failure requiring intubation was more common in patients with new onset myasthenia gravis after PD-1 inhibitor therapy, including pembrolizumab, than in patients with pre-existing myasthenia gravis who experienced disease exacerbation after PD-1 inhibitor therapy (38.8% vs. 11.1%). They reported a similar difference in mortality, with deaths occurring in 27.02% of new-onset PD-1 inhibitor myasthenia gravis cases, compared to no deaths in the pre-existing myasthenia gravis exacerbation group. Most deaths were attributed to acute respiratory failure from myasthenia gravis associated with

---

[23] Takai, M, et al. Simultaneous pembrolizumab-induced myasthenia gravis and myocarditis in a patient with metastatic bladder cancer: A case report. *Urology Case Reports* 31 (2020) 101145.
[24] Petitjean, N, et al. Pembrolizumab induced fatal myositis and myocarditis. *Societe Francaise de Pharmacol. Therap*. 33 (Suppl. S1): 48-90, Abstract PS1-082.
[25] Hajihossainlou, et al. *BMJ Case Rep.* 2021 Aug 23;14(8) :e243764.

pembrolizumab or nivolumab.

51. In 2021, Rubio-Infante, et al.[26] conducted a more recent systematic literature review and study aimed to estimate the incidence of cardiac irAEs in patients treated with ICIs. The authors performed a systematic literature search and meta-analysis of cardiac toxicities associated with ICIs, including pembrolizumab. They analyzed the incidence and characteristics of cardiac irAEs in 1,265 papers published prior to August 31, 2020. Of the 4,751 patients studied, 1.3% presented cardiac irAEs, with myocarditis being the most frequent (50.8%) and noted 15 patients died (24.6%) due to cardiac irAEs. The authors found that the incidence of cardiac irAEs (29.5%) was higher for patients receiving pembrolizumab monotherapy than any other ICI studied. Additionally, cardiotoxicity mortality was higher from pembrolizumab than other ICIs.

52. In 2021, Hamada, et al.[27] conducted a systematic review and meta-analysis to evaluate the risk of myositis associated with ICI for solid tumors by analyzing phase III randomized controlled trials of anti-programmed death-1/ligand-1 (PD-1/PD-L1) and anti-cytotoxic T-lymphocyte antigen-4 (CTLA-4). To complement this analysis with clinical data, they evaluated published ICI case reports along with cases from the authors' institutional registry. The registry was comprised of 422 patients treated with ICIs alone or in combination from September 2014 to June 2021. The analysis revealed an incidence of ICI-related myositis in 6,838 patients in 18 randomized controlled trials of 0.38% (odds ratio 1.96; 95% confidence interval 1.02–3.75) for patients receiving ICIs compared with controls. There were 8 studies including in the meta-analysis for pembrolizumab-induced myositis. The crude incidence of myositis associated with

[26] Rubio-Infante, N, et al. Cardiotoxicity associated with immune checkpoint inhibitor therapy: a meta-analysis. *European Journal of Heart Failure* 2021; 23: 1739–1747.

[27] Hamada, et al. Incidence and Distinct Features of Immune Checkpoint Inhibitor-Related Myositis From Idiopathic Inflammatory Myositis: A Single-Center Experience With Systematic Literature Review and Meta-Analysis. *Front. Immunol.* 2021; 12:803410.

pembrolizumab-induced myositis was approximately 1 per 3000.

53. In 2021, Pathak, et al.[28] systematically reviewed and summarized all cases of IM3OS/MMM reported in the literature associated with Keytruda's class of ICIs. Studies reporting IM3OS/MMM were identified in Embase and MEDLINE. The review included case reports and case series published in journals or presented at conferences from 2001 to July 14, 2021. A total of 60 cases were eligible. The patients' median age was 71 years. There were 19 separately reported cases of MMM induced by pembrolizumab, and nine fatalities (50%) from MMM associated with pembrolizumab.

54. In 2023, Boutros, et al.[29] published a pooled analysis of concurrent myocarditis and myositis cases to better characterize the risks of these immune-mediated adverse reactions associated with immune checkpoint inhibitors. The authors collected data from six Italian centers and conducted a literature search for published case reports and case series of ICI-associated myocarditis and myositis from July 2010 through July 2021. In total, they identified 120 cases of concurrent ICI-induced myocarditis and myositis from the Italian centers and published literature. The authors described the study as one of the largest collections of individual cases of immune-related myocarditis/myositis. The authors reported 39 cases of pembrolizumab-induced concurrent myocarditis/myositis among the 120 cases analyzed, including 14 deaths attributed to pembrolizumab. The mortality rate for pembrolizumab-induced myocarditis/myositis was 35%, and pembrolizumab was associated with more deaths than any other ICI analyzed in the study. The authors also identified statistically significant risk factors associated with worse outcomes,

---

[28] Pathak, et al. Immune Checkpoint Inhibitor-Induced Myocarditis with Myositis/Myasthenia Gravis Overlap Syndrome: A Systematic Review of Cases. *The Oncologist* 2021; 26:1052–1061.

[29] Boutros, A, et al. Neuromuscular and cardiac adverse events associated with immune checkpoint inhibitors: pooled analysis of individual cases from multiple institutions and literature. *ESMO Open* 2023; 8 (1): 1-15.

including earlier onset of immune-related adverse events and concurrent myocarditis/myositis, compared to myocarditis or myositis alone.

55. In October 2023, Liu, et al.[30] published an analysis of the FDA Adverse Event Reporting System ("FAERS") database to characterize the musculoskeletal toxicity profile of immune checkpoint inhibitors from January 2010 through March 2021. Using reporting odds ratios, Bayesian confidence network algorithms, and MedDRA 25.0 terms, the authors analyzed suspected ICI-induced musculoskeletal adverse events associated with seven anti-PD-1 drugs, including pembrolizumab.

56. The authors defined musculoskeletal adverse events to include myasthenia gravis, myositis, rhabdomyolysis, and related conditions. The study found that pembrolizumab had the strongest association with immune- and autoimmune-mediated myositis (ROR=74.10) and a higher number of myositis reports than other ICIs, including other anti-PD-1 drugs. Among patients with myositis, 36% to 54% also had concurrent myocarditis. Pembrolizumab also showed one of the strongest associations among the ICI class of drugs with myasthenia gravis (ROR=19.61) and the highest reported association with myasthenic crisis (ROR=9.92) among the ICIs studied.

57. The Liu study identified 243 suspected cases of pembrolizumab-induced myositis with 80 associated deaths, 165 suspected cases of pembrolizumab-induced myasthenia gravis with 50 associated deaths, and 65 suspected cases of pembrolizumab-induced rhabdomyolysis with 21 associated deaths. The authors concluded that pembrolizumab showed a more pronounced and higher risk of musculoskeletal toxicity profile than other ICIs. They discussed prior research also

---

[30] Liu, H, et al. Musculoskeletal adverse events induced by immune checkpoint inhibitors: a large-scale pharmacovigilance study. *Front. Phar*macol. 14:1199031.

finding pembrolizumab had the highest risk of inducing neuromuscular disease, and through their own analysis identified a strong association between pembrolizumab and musculoskeletal events, including myasthenia gravis and myasthenic syndrome.

58. In 2023, Zotova, et al.[31] reported on their literature search and found that in 37% of cases myocarditis developed after the first administration of ICI and that ICI-associated myocarditis most often occurred during the use of pembrolizumab (75 cases or 30.7%) as compared to other ICIs in its class. The mortality rate for pembrolizumab-induced myocarditis was noted to be 32.8%. The authors found that Keytruda carried the highest risk of death from ICI-induced myocarditis in the group receiving anti-PD-1 therapy.

59. In 2023, Zhao, et al.[32] performed an analysis of the published literature and collected pembrolizumab-induced myasthenia gravis cases from Chinese and English databases published from September 1, 2014, to June 30, 2022. The authors analyzed 60 articles involving sixty-five patients with a median age of 73 years. Pembrolizumab was discontinued in 63 patients (96.9%) and continued in only two patients (3.1%). The authors also observed that myasthenia gravis overlapped with myositis and myocarditis in approximately half of the patients. The overlap between myositis/myocarditis and myasthenia gravis is increasingly recognized as a common predictor of poor outcomes for Keytruda and other ICI patients. In this analysis, the mortality rate based on 10 deaths was 15.4% from pembrolizumab-induced MG. Zhao, et al. recommended that clinicians monitor and consider the risks of pembrolizumab-induced MG, especially during the first eight weeks of therapy, and that patients should be treated by specialists as early as possible

[31] Zotova, L. Immune Checkpoint Inhibitors-Related Myocarditis: A Review of Reported Clinical Cases. *Diagnostics* 2023, 13, 1243.
[32] Zhao, S, et al. Clinical features, diagnosis, and management of pembrolizumab-induced myasthenia gravis. *Clinical and Experimental Immunology*, 2023, 211, 85–92.

regardless of the severity of the initial symptoms.

60. In 2023, Marco, et al.[33] reported a single-center analysis of myasthenia gravis in patients treated with immune checkpoint inhibitors from 2017 to 2022. Six patients developed myasthenia gravis, including two pembrolizumab-associated cases and one pembrolizumab-associated fatality due to MMM. The authors also reported that the proportion of MMM among anti-PD-1 patients in their study was 67%, higher than previously reported.

61. In 2024, Hassan, et al.[34] conducted a systematic review of published literature, ClinicalTrials.gov, and Google Scholar through December 2023 for cases of pembrolizumab-induced myocarditis. The authors identified 46 cases of pembrolizumab-induced myocarditis, nearly 90% of which developed after the first or second Keytruda dose. The reported mortality rate was 34.8%.

62. In 2024, Lipe, et al.[35] published a systematic literature review addressing ICI-associated MMM in emergency and acute care settings. The authors described MMM as a potentially lethal toxicity syndrome characterized by overlapping ICI-associated myocarditis, myositis, and myasthenia gravis, and noted that it may not be widely recognized by emergency clinicians and other acute care practitioners. The review was intended to raise awareness of this life-threatening triad of immune-related adverse events and to recommend and address clinical management considerations for patients presenting with this complex syndrome in emergency department or urgent care settings.

---

[33] Marco, C, et al. Myasthenia Gravis Induced by Immune Checkpoint Inhibitors: An Emerging Neurotoxicity in Neuro-Oncology Practice: Case Series. *J. Clin. Med.* 2023; 12, 130.

[34] Hassan, W, et al. Pembrolizumab-induced myocarditis: A systematic review of case reports. *J Clin Oncol* (2024) 42, e14605.

[35] Lipe, DN, et al. Myocarditis, Myositis, and Myasthenia Gravis Overlap Syndrome Associated with Immune Checkpoint Inhibitors: A Systematic Review. *Diagnostics* 2024; 14, 1794.

63. Lipe, et al. searched the published literature for ICI-associated MMM cases from January 2010 through August 2023. After applying eligibility criteria, the authors identified 31 studies and 50 published cases of ICI-induced MMM. Pembrolizumab accounted for the largest number of MMM cases identified in the review: 40% of all published ICI-associated MMM cases. The in-hospital mortality rate for ICI-induced MMM was 38%. The authors concluded that these findings underscore the need for early recognition and effective management, particularly in emergency department and urgent care settings where timely intervention can be lifesaving. They also concluded that pembrolizumab showed a predominant casual association with MMM.

64. In 2021, the American Society of Clinical Oncology ("ASCO")[36] convened a multidisciplinary panel of medical experts to increase awareness, outline prevention and treatment strategies, and to update its guidelines for the management of immune-related adverse events (irAEs) in patients treated with immune checkpoint inhibitors, including Keytruda.

65. The ASCO guideline was based on a systematic literature review of evidence published from 2017 through 2021 and an informal consensus process. The ASCO guideline included specific evaluation and clinical recommendations for suspected immune checkpoint inhibitor-related myositis, myasthenia gravis, myocarditis, AKI, and overlapping presentations, including when to hold or discontinue ICI therapy, what evaluations, diagnostic testing, and laboratory studies should be performed, the risk of severe and fatal outcomes, and immediate interventions that should be considered to reduce the risk of deterioration or death.

66. ASCO made recommendations for organ system toxicity associated with ICIs, including pembrolizumab and recommendations for the evaluation, diagnosis, treatment and

---

[36] Schneider, BJ, et al. Management of Immune-Related Adverse Events in Patients Treated With Immune Checkpoint Inhibitor Therapy: ASCO Guideline Update. *J Clin Oncol* 39:4073-4126.

management for ICI-induced myositis, myasthenia gravis, myocarditis, and overlapping presentations provided specific diagnostic, treatment, and ICI-discontinuation guidance, addressed mortality risks, and described medical treatment interventions not disclosed in the U.S. Keytruda label, including the use of IVIG treatment, plasma exchange, immunosuppressive therapy, and dialysis.

67. For musculoskeletal toxicities, including myositis, myasthenia gravis, myocarditis, and MMM overlap, ASCO identified specific symptoms for physicians to monitor for the risk of MMM, and recommended referrals to specialists, including early referrals to rheumatology and neurology, and recommended detailed neurological examinations. For myocarditis, ASCO recommended treating physicians include cardiac testing (EKG, cardiac MRI, and Troponin), as well as specific imaging studies to identify and protect against the risk of overlapping myasthenia gravis and myositis, including MRI, electrophysiologic testing (EMG), and laboratory testing.

68. ASCO also provided recommendations for the management of myositis alone and in combination with myocarditis or myasthenia gravis, including stopping ICI therapy, immediate hospitalization and early referrals to specialists with high doses of prednisone or equivalents use of plasmapheresis, IVIG, and immunosuppressant therapies such as TNF-inhibitors or IL-6 antagonists, methotrexate, mycophenolate, or rituximab to prevent deaths and serious outcomes.

69. ASCO also made recommendations on the evaluation, diagnosis, treatment and management of acute kidney injuries and rhabdomyolysis neurological toxicities, including myasthenia gravis and separately myocarditis recommend early referrals to specialists (neurologists, cardiologists, rheumatologists). It further recommended prompt admission to hospitals along with specific respective treatments (stopping ICI and starting different therapies), disclosure of important risk factors, mortality rates, and treatment steps for each separate condition

and overlapping MMM.

70. The ASCO treatment guidelines also identified heightened risks of MMM in patients with pre-existing autoimmune conditions and included new warnings for the increased risk of ICI-induced MMM, including comparison risks to chemotherapy, and recommend that prescribing and treating physicians monitor patients for early symptoms and the potential for death.

71. On October 18, 2022, the European Society for Medical Oncology (ESMO) published a Clinical Practice Guideline (CPG) to provide specific guidance on irAE management.[37] ESMO also made specific recommendations for the evaluation, prevention, mitigation, and management of ICI-induced myositis, myasthenia gravis, myocarditis, and overlapping MMM. Many of ESMO's specific recommendations were not incorporated into the Keytruda labeling, including recommendations for the evaluation, prevention, mitigation, treatment and management of specific toxicities, including myositis, myocarditis, myasthenia gravis, overlapping MMM, and AKI. The ESMO safety guidance is similar to the ASCO recommendations, includes specific timeframes in which to institute medical treatments, and makes safety recommendations for when patients who have suspected MMM to be seen as an inpatient instead of an outpatient to provide for earlier interventions that reduce the risk of mortality. The majority of the ASCO and ESMO safety recommendations are not included in the Keytruda label.

72. The safety information in the sections above should have been but was not disclosed to prescribing physicians and the FDA.

[37] Haanen, J., et all Management of toxicities from immunotherapy: ESMO Clinical Practice Guideline for diagnosis, treatment and follow-up. *Ann Oncol.* 2022; 33(12):

**(iii) Increased Risks in Subpopulations: Elderly, Pre-Existing Autoimmune Conditions, and Pre-Existing Cardiac Disease**

73. Since 1998, the FDA has required drug companies such as Defendant to follow the "Demographic Rule,"[38] which requires them to assess and warn for subpopulation risks by age, gender, and racial subgroups.[39] The Demographic Rule requires Defendant to assess subpopulation risk information from published and unpublished studies, the global scientific literature, and data from the FDA's adverse event database and Defendant's Keytruda safety database, and to provide subpopulation risk information in the warnings, precautions, and adverse reactions sections of the Keytruda labeling. 21 C.F.R. § 314.50 and 201.57.

**a. Increased Risk of Myasthenia Gravis, Myositis and Myocarditis in the Elderly**

74. The FDA generally defines the "elderly" or "geriatric" population as individuals 65 years of age and older. This definition is used for analyzing the safety and effectiveness of drugs and other products in clinical trials. While age 65 is the general threshold, the FDA also recommends that sponsors consider further sub-grouping the elderly population in labeling, such as: 65-74 years of age, 75-84 years of age, and 85 years of age or older. This is because the needs and responses to medications can vary significantly within the broader geriatric population and can impact the risk of fatalities in the elderly. Furthermore, the FDA emphasizes the importance of including a substantial representation of older adults in clinical trials to ensure that drugs are safe and effective for the entire population likely to use them.

75. Multiple papers identify an increased risk of MMM from Keytruda in the elderly.

---

[38] 21 C.F.R. § 314.50(d)(5).
[39] FDA Guidance for Industry: Adverse Reactions Section of the Labeling For Human Prescription and Biological Products-Content and Format, March of 2006.

In 2019, Safa, et al.[40] performed a case series and literature review at MD Anderson Cancer Center and reported new safety information regarding the coexistence of myasthenia gravis, myositis, and myocarditis in patients exposed to pembrolizumab, especially in elderly populations. The authors identified a safety signal and advised that clinicians should consider the risks and benefits for each individual pembrolizumab patient, predominantly in the elderly and patients receiving ICI as an adjuvant therapy (like Mr. Dombeck) and recommended that physicians pay particular attention to elderly subpopulation patients.

76. In 2019, Johnson, et al.[41] performed a disproportionality analysis using Vigibase, the World Health Organization pharmacovigilance database, comparing neurologic adverse event reporting in patients receiving ICIs. Neurologic adverse events were classified by group queries using Medical Dictionary for Regulatory Activities between database inception to September 28, 2018. Associations between ICIs and neurologic AEs were assessed using reporting odds ratios (ROR) and information component (IC). In the Vigibase database by 2018, there were 116 reports of myasthenia gravis (58.88%), 36 reports of encephalitis/myelitis (19.35%), and 27 reports (42.19) of Guillain-Barre syndrome associated with pembrolizumab monotherapy.

77. Pembrolizumab represented nearly 60% of all reports of myasthenia gravis compared to other anti-PD-1 drugs, almost twice as high as nivolumab. Myasthenia gravis was characterized by high fatality rates (20%), early onset (median 29 days), and frequent concurrent myocarditis and myositis. The authors also reported that the patients who died from MMM were in the elderly population.

---

[40] Safa, H. et al., Immune checkpoint inhibitor related myasthenia gravis: single center experience and systematic review of the literature. *Journal for ImmunoTherapy of Cancer* (2019) 7:319:1-11.

[41] Johnson DB, et al. Neurologic toxicity associated with immune checkpoint inhibitors: a pharmacovigilance study. *J Immunotherapy Cancer* 2019; 7:1–9.

78. Patients with overlap conditions had worse outcomes than those with myositis alone, and 79% of them developed respiratory failure. Eight patients died as a result of ICI-myositis, and all had overlap syndrome with myasthenia gravis or myocarditis. None of the patients with myositis alone died, while 42% of the patients with overlap syndrome died. Patients who died of myositis were older than those who did not (median age 77 years versus 69 years). All patients who died of ICI-myositis had developed respiratory failure, and most (75%) developed an infection.

79. In 2021, Mikami, et al.[42] conducted an observational, retrospective, and pharmacovigilance study based on the FAERS database collected between January 2014 and December 2019. ICI-related AEs were defined as adverse reactions in patients using anti-PD-1 (nivolumab and pembrolizumab), anti-PD-L1 (atezolizumab, avelumab and durvalumab), and anti-CTLA-4 (ipilimumab and tremelimumab). Neurologic adverse events previously reported to be associated with ICI were evaluated in the disproportionality analysis using the reporting odds ratio (ROR). There were 115/335 (34%) reports of MG for pembrolizumab, and 145/527 (27%) reports of myositis for pembrolizumab. Differences between subgroups were observed, including older age being identified as a risk factor for myasthenia gravis, myositis and fatal neurologic adverse events.

80. In 2021, Aldrich, et al.[43] reported that ICI-induced myocarditis and myositis or myasthenia gravis (overlap syndromes) carries a 42% mortality rate. In contrast, patients with myositis alone did not carry a risk of fatality. Further, the authors found that the patients who died

---

[42] Mikami, T, et al. Neuroimmunological adverse events associated with immune checkpoint inhibitor: a retrospective, pharmacovigilance study using FAERS database. *Journal of Neuro-Oncology* (2021) 152:135–144.
[43] Aldrich, J, et al. Inflammatory Myositis in Cancer Patients Receiving Immune Checkpoint Inhibitors *Arthritis & Rheumatology* May 2021; 73,5: 866–874.

from ICI-induced MMM (including pembrolizumab) were older than those who recovered.

81. In 2021, Pathak, et al.[44] reported on their review of ICI-induced MMM and found that these events were disproportionately affecting the elderly, with a median age of 71 years old.

82. Shan, et al.[45] reported a disproportionality analysis of gender and age disparities in cardiac immune-mediated adverse events associated with ICIs using FDA FAERS data from 2003 to 2024. The authors used reporting odds ratios ("ROR") and proportional reporting ratios ("PRR") to screen for cardiac immune-related adverse events and evaluate associations with age and gender. They noted that a higher PRR reflects a stronger adverse event signal and a stronger statistical association between the drug and the target adverse event. The authors reported a strong association between pembrolizumab and myocarditis, with a PRR of 20.94, as well as a moderate safety signal for cardiac failure. In age-stratified analysis, the elderly group showed a much stronger myocarditis signal than the younger group for pembrolizumab-induced myocarditis, with a PRR of 36.45 in elderly patients compared to 10.87 in younger patients. This indicated a higher susceptibility to pembrolizumab-induced myocarditis among elderly patients like Mr. Dombeck.

83. In 2025, Xu, et al.[46] performed an analysis of the characteristics of adverse reactions in cancer patients treated with pembrolizumab based on the FDA's Adverse Event Reporting System (FAERS) database, collecting adverse event reports related to pembrolizumab from 2013 to June 2024. The study included assessment of the characteristics and risk factors of fatality reports. The main analysis variables included gender, age, cancer type, country, reporter type, and

---

[44] Pathak, et al. Immune Checkpoint Inhibitor-Induced Myocarditis with Myositis/Myasthenia Gravis Overlap Syndrome: A Systematic Review of Cases. *The Oncologist* 2021; 26:1052–1061.

[45] Shan, et al. Gender and age disparities in cardiac immune-related adverse events associated with immune checkpoint inhibitors: a pharmacovigilance analysis of the FAERS database *BMJ Open* 2025; 15:e090087.

[46] Xu, et al. Retrospective analysis of pembrolizumab-related adverse reactions and death outcomes based on the FAERS database *BMC Cancer* (2025) 25: 917.

adverse reaction outcomes. The authors reported:

- A total of 46,883 adverse reactions, including 5,483 reports with fatal outcomes.

- The number of adverse events from pembrolizumab has been increasing since 2013, especially peaking in 2022 and 2023.

- The number of serious events from pembrolizumab increased significantly with age, especially in the 51–65 and 66–80 age groups. The age of patients who died was concentrated in the elderly group (≥ 65 years old), and the median treatment duration time of pembrolizumab was 17 days.

- For renal disorder reactions, there was a higher proportion of deaths from AKI-related disorders from pembrolizumab in the elderly population (ages 65 and up), which represented the majority of deaths from pembrolizumab-related AKI.

84. The incidence of serious adverse events in elderly patients was significantly higher than that in young patients, and the mortality rate in elderly patients was higher. The proportional reporting ratios (PRR) for renal adverse events were also found to be substantially elevated. The authors advised that clinicians should pay particular attention to the immune response of elderly patients when using this drug and strengthen monitoring and management.

**b. Increased Risk of Myasthenia Gravis, Myositis and Myocarditis in Patients with Underlying Autoimmune Disease**

85. FDA regulations for prescription drugs also require that when an underlying disease creates a substantial risk of harm from a drug, the drug's labeling should disclose those increased risks in patients with the particular disease stated. 21 C.F. R. §201.57.

86. Prior to Mr. Dombeck's death, several studies reported increased risks of myositis, myocarditis and myasthenia gravis in patients with pre-existing autoimmune diseases. For

example, Moriera, et al.[47] noted that multiple studies have shown that pre-existing autoimmunity may also increase the likelihood of myositis. In 2018, Martinez-Calle, et al.[48] reported on a 67-year-old female diagnosed with multiple myeloma who developed fatal immune-related myocarditis in a randomized clinical trial after a single dose of pembrolizumab. The authors noted that the development of myocarditis with a single dose of pembrolizumab suggests that pre-existing immunity is a plausible explanation for the development of irAE associated with a single dose of pembrolizumab, especially for MMM. They noted that history of autoimmunity is an exclusion criterion for ICI clinical trials, including for Keytruda. Although the authors recommended that screening and warnings be given to patients to prevent the lethality of ICI-induced myocarditis and in patients with pre-existing autoimmune disease, only baseline ECG is conducted for patients treated with pembrolizumab.

87. In 2021, Aykac, et al.[49] reported on their single case of pembrolizumab-induced myasthenia gravis resulting in fatality and noted that "physicians should be mindful of possible exacerbations of autoimmune diseases and associated risks during treatment with immune checkpoint inhibitors, including pembrolizumab. Therefore, when planning treatment with pembrolizumab, both the pathologic malignancy type and pretreatment immune disorder should be considered." Additional studies also found independent risk factors that have been shown to increase Mr. Dombeck's risk of immune mediated reactions, including cardiac myopathies and a prior history of autoimmune disease.[50]

---

[47] Moriera, A, et al. Myositis and neuromuscular side-effects induced by ICIs. *European Journal of Cancer* 2019; 106: 12e23.
[48] Martinez-Calle, et al. Anti-PD1 associated fulminant myocarditis after a single pembrolizumab dose: the role of occult pre-existing autoimmunity. *Haematologica* 2018; 103:e318.
[49] Aykac et al, Pembrolizumab-induced Myasthenia Gravis in a Patient with Thymic Carcinoma: A Case Report and Review of the Literature, *Neurological Sciences and Neurophysiology*, 2021; 38(1): 73-78.
[50] Kartolo, A, et al. Predictors of Immunotherapy-Induced Immune-Related Adverse Events. *Curr. Oncol.* 2018, *25*(5), 403-410.

88. Mr. Dombeck was diagnosed with autoimmune disease prior to starting Keytruda. Studies recommend that special care should be taken when administering ICIs to patients with a history of autoimmune diseases due to increased risks of conditions such as myasthenia gravis, myositis, myocarditis, and related mortality. Multiple papers recommend that baseline transthoracic ECGs should be conducted and suggest the use of biomarkers for prediction of myocardial immune-mediated damage and early diagnosis of myocarditis.[51] The authors of those papers also noted that baseline troponin and CK-MB are appropriate studies to use to monitor for autoimmune myopathy and cardiomyopathy.

89. The high volume of fatalities involving pembrolizumab-induced myositis and myocarditis particularly in patients with pre-existing autoimmune disease led additional authors to recommend close cardiac monitoring when pembrolizumab is administered on an outpatient basis.[52] The authors also found that the combination of myositis and myocarditis can aggravate the mortality rate of irAEs. As a result of the increased risk of MMM from pembrolizumab, certain medical groups have created an algorithm for the initiation of ICI therapy and follow-up to avoid the risk of developing fatal myocarditis in future patients under ICI therapy at their hospital.[53] The authors suggest that routine follow-up of cardiac biomarkers, including CK and cardiac troponin I as well as ECG, should be performed to promptly identify any possible ICI-induced myocarditis.

90. Defendant's foreign labeling also contains stronger warnings for the pre-existing auto-immune subpopulation (like Mr. Dombeck) than its U.S. label. For example, in the European Union, Defendant's Keytruda labeling directly warns E.U. patients that "side effects may be higher

---

[51] *See* Martinez-Calle, et al, Matsui, et al., Katsume, et al., and Todo, et al.
[52] Matsui, H, et al. Fatal Case of Myocarditis Following Myositis Induced by Pembrolizumab Treatment for Metastatic Upper Urinary Tract Urothelial Carcinoma. *Int Heart J* 2020; 61: 1070-1074.
[53] *Id.*

if you have an autoimmune disease" and that Keytruda can cause "frequent flares of your autoimmune disease. These side effects can sometimes become life-threatening and can lead to death." *See* Keytruda Patient Information Leaflet. Defendant does not provide these subpopulation warnings to U.S. consumers and U.S. prescribing physicians. Unlike its U.S. labeling, Defendant also requires its European patients to carry a "Patient Card" for four months after receiving Keytruda noting that Keytruda "may cause some serious side effects which can sometimes become life-threatening and lead to death" and encourages consumers to immediately seek specialized medical care if they develop adverse health symptoms.

**c. Increased Risk of Myasthenia Gravis, Myositis and Myocarditis in Patients with Underlying Cardiac Diseases**

91. Studies recommend that special care should be taken when administering checkpoint inhibitors to patients with a history of cardiac disease due to increased risks of MMM and mortality. Multiple papers recommend that baseline TT echocardiograms be conducted and that biomarkers for prediction of myocardial immune-mediated damage and/or early diagnosis of myocarditis should be explored.[54] The authors of those papers also noted that baseline troponin and CK-MB laboratory testing are appropriate for these patients.

92. Additional published papers have called for close cooperation between cardiologists and cancer specialists which are essential to correctly manage these irAEs caused by ICI therapies, including myositis and myocarditis associated with pembrolizumab. Multiple fatalities involving pembrolizumab-induced myositis and myocarditis suggested a strong need for early and close cardiac monitoring when pembrolizumab is administered on an outpatient basis.[55]

[54] *See* Martinez-Calle, et al, Matsui, et al., Katsume, et al., and Todo, et al. below.
[55] Matsui, H, et al. Fatal Case of Myocarditis Following Myositis Induced by Pembrolizumab Treatment for Metastatic Upper Urinary Tract Urothelial Carcinoma. *Int Heart J* 2020; 61: 1070-1074.

93. Additionally, multiple reports on the use of pembrolizumab have described the co-existence of myositis and myocarditis. Myositis has been reported to be associated with 20-40% of myocarditis cases. As a result of the increased risk of myositis and myocarditis from pembrolizumab, certain medical groups have created an algorithm for the initiation of ICI therapy and follow-up to avoid the risk of developing fatal myocarditis in future patients under ICI therapy at their hospital. The authors suggest that routine follow-up of cardiac biomarkers, including CK and cardiac troponin I as well as ECG, should be performed to identify any possible ICI-induced myocarditis and myositis promptly in order to reduce the risk of injury and mortality.

94. For example, in 2020, Todo, et al.[56] recommended that in order to prevent the combination of MMM and increased mortality from myocarditis, screening of cardiovascular disease should be mandatory for prescribing pembrolizumab and also recommended early intervention using corticosteroids to avoid lethal myocardial damage in cases with abnormal ECG. The authors concluded that: (a) regular screening using CK, CK-MB, and troponin I is needed for early detection of neuromuscular complication; (b) cardiac complications must be identified by repetitive ECG to avoid lethal cardiac damage by early intervention; and (c) comprehensive management teams play a pivotal role in early detection and intervention. The authors further stated that (a) early detection of myocarditis, prompt cardio-oncology evaluation to rule out other etiologies, and expedited steroid treatment provide a reduction in the risk of lethal outcomes; and (b) baseline and serial troponin measurements contribute to early detection of individuals at increased risk of MMM.

---

[56] Todo, et al. Pembrolizumab-induced myasthenia gravis with myositis and presumable myocarditis in a patient with bladder cancer. *IJU Case Reports* (2020) 3, 17-20.

95. In 2021, scientists[57] also strongly recommended that baseline and serial measurements be recommended and implemented in order to prevent the risk of death from pembrolizumab-induced myocarditis. These early detection and monitoring recommendations are particularly critical for high-risk patients with pre-existing cardiac and autoimmune disease.

96. In 2026, Botta, et al.[58] reported an immunologic and biologic analysis of a patient who developed pembrolizumab-induced myasthenia gravis and myositis and tested positive for genetic alleles associated with those conditions. The patient's HLA genotype showed an autoimmune haplotype with class I HLA alleles associated with increased risk of myositis (A02, B08, C07, DRB103) and myasthenia gravis (B08 and DRB103). The authors cited two additional published studies reporting strong associations between these alleles and myasthenia gravis or myositis in other populations. The authors concluded that screening for autoimmune-associated HLA haplotypes before PD-1/PD-L1 immune checkpoint therapy could help warn physicians of an increased risk of life-threatening immune-mediated adverse events. Defendant's Keytruda label does not warn for the increased risk of myasthenia gravis, myositis and myocarditis to Mr. Dombeck's subpopulations or recommend genetic testing to mitigate the risk of these adverse events.

**d. Increased Risk of Keytruda-Induced AKI and Renal Failure**

97. The Keytruda label significantly understates the risk of Keytruda-induced acute kidney injury and renal failure.[59]

---

[57] Puzanov, et al. Clinical characteristics, time course, treatment and outcomes of patients with immune checkpoint inhibitor-associated myocarditis. *Journal for ImmunoTherapy of Cancer* 2021;9: e002553.
[58] Bota, C, et al. Myositis/Myasthenia after Pembrolizumab in a Bladder Cancer Patient with an Autoimmunity-Associated HLA: Immune–Biological Evaluation and Case Report. *Int. J. Mol. Sci.* 2021, 22, 6246.
[59] In fact, Defendant strengthened its (still deficient) kidney warnings in the 2025 label (*i.e.*, after Mr. Dombeck's death) to include additional safety information regarding the risk of AKI from Keytruda.

98. In 2017, seven years before Mr. Dombeck's death from Keytruda, Wanchoo, et al.[60] published results from their in-depth review of ICI-related AKI, including pembrolizumab, among their patient cohort. The authors conducted a search of indexed manuscripts to better understand the incidence of AKI related to ipilimumab, pembrolizumab, and nivolumab-induced renal toxicities. They reviewed a total of 17 articles and original investigations that included over 100 patients with renal outcomes secondary to the 3 agents. The authors found that the incidence of PD1-induced (including pembrolizumab) AKI was as high as 24.5%.

99. In 2018, Kartolo, et al.[61] published their findings identifying independent risk factors that have been shown to increase Mr. Dombeck's risk of immune mediated reactions (myocarditis and AKI) associated with prior history of autoimmune disease. The study confirmed that history of autoimmune disease (adjusted OR: 9.55) was associated with a higher risk of developing immune-related adverse events from ICIs, including AKI from pembrolizumab.

100. In 2019, Seethapathy, et al.[62] published new safety information on ICI-related AKI and evaluated a group of over 1,000 patients from 2011-2016. The authors found 169 patients with AKI after taking an ICI (including Keytruda) and calculated an incidence of AKI of 28.7 per 100 person-years for any AKI, 13.4 per 100 person-years for prolonged/sustained AKI, and 4.8 per 100 person-years for ICI-related AKI. These incidences of AKI are up to 20 times higher than those disclosed in the U.S. Keytruda label.

101. The same study also found that the mortality rate from ICI-induced AKI was

[60] Wanchoo, et al. Adverse Renal Effects of Immune Checkpoint Inhibitors: A Narrative Review. *Am J Nephrol* 2017; 45:160–169.
[61] Kartolo, A, et al. Predictors of Immunotherapy-Induced Immune-Related Adverse Events. *Curr. Oncol.* 2018, *25*(5), 403-410.
[62] Seethpathy, et al.. The Incidence, Causes, and Risk Factors of Acute Kidney Injury in Patients Receiving Immune Checkpoint Inhibitors. *Clin J Am Soc Nephrol*. 2019 Oct 31;14(12):1692–1700.

extremely high with patients that developed sustained AKI having a fatality rate of 67% and – similar to Mr. Dombeck – the deaths occurred within a median 22 days after the onset of the ICI-induced AKI. The study also evaluated whether there were any risk predictors for sustained AKI from ICI-related AKI. The authors' statistics indicated that patients such as Mr. Dombeck would have a much higher incidence of ICI-related AKI at 10.0 per 100 person-years. The authors concluded that, compared to previous findings, AKI is common (not rare) in patients receiving ICI therapy, including pembrolizumab.

102. In 2022, Gerard, et al.[63] conducted a study using a case-control methodology and also identified older age (elderly) as a risk factor for ICI-induced AKI.

103. In 2023, Liu, et al.[64] conducted a systematic review and a random-effect meta-analysis of risk factors for ICI-induced AKI. The authors also found that the elderly were at increased risk of ICI-induced AKI.

104. In 2022, Zhu, et al.[65] noted that AKI was a severe adverse event associated with ICIs, including Keytruda, and recommended new safety studies into ICI-related AKI. As part of their overall analysis, the authors conducted a systematic review of randomized controlled trials (RCTs) and a real-world study by extracting data from FAERS. For all ICIs, the FAERS pharmacovigilance data identified 1918 cases of AKI related to ICI therapy. ICIs, including pembrolizumab, were significantly associated with over-reporting frequencies of AKI (ROR=2.38). The median onset time of AKI was 48 days, 77.5% of patients discontinued the use

---

[63] Gerard AO, *et al.* Risk factors associated with immune checkpoint inhibitor-induced nephropathy: a case-control study. *Clin Kidney J* 2022; 15: 1881–1887.
[64] Liu C, et al. Incidence and risk factors of acute kidney injury in cancer patients treated with immune checkpoint inhibitors: a systematic review and meta-analysis. *Front. Immunol*. 2023; 14:1173952.
[65] Zhu, Acute kidney injury associated with immune checkpoint inhibitors: A pharmacovigilance study. *International Immunopharmacology* Oct. 2022; 113: 109350.

of ICIs, and 15.9% of patients resulted in death.

105. In 2024, Li, et al.[66] performed a retrospective analysis of patients who initiated ICI-based therapy between 2017 and 2021 at Ohio State University. Of 248 total patients, 33 (13.3%) developed AKI and, of the 103 patients who received pembrolizumab monotherapy, 11 (10.7%) developed AKI. Among the 115 patients treated with pemetrexed, pembrolizumab, and carboplatin, 20 (17.4%) developed AKI. There were 11 reports of renal failure associated with or caused by pembrolizumab (33%).

106. The safety information in the sections above should have been but was not disclosed to prescribing physicians and the FDA.

**(iv) Keytruda Lacks Efficacy for Adjuvant and Neoadjuvant Use**

107. Merck heavily markets (and massively profits from) the use of Keytruda for adjuvant and neoadjuvant therapy,[67] including for the melanoma neoadjuvant and adjuvant therapy purpose used by Mr. Dombeck. Several authors have emphasized that surgery alone cures many patients with non-metastatic melanoma. Despite Merck's aggressive advertising push to doctors, hospitals, government agencies and health insurance companies, the use of Keytruda as neoadjuvant and adjuvant therapy does not meaningfully improve overall survival.

108. Pembrolizumab was granted orphan drug designation for the treatment of advanced melanoma in late 2012[68] and was subsequently awarded breakthrough therapy designation for

[66] Li, et al. Association Between Developing Acute Renal Failure and One-Year Survival in Patients with Metastatic NSCLC Who Have Received Immune Checkpoint Inhibitor-Based Front-Line Treatment. *J Immunother Cancer* 2024;12 (Suppl 2): A1–A1683.

[67] Neoadjuvant therapy is the administration of therapeutic agents before the primary treatment (e.g., surgery) to reduce the size of a tumor. Adjuvant therapy is given after primary surgery to address remaining cancer cells.

[68] Orphan drug designation is granted by the FDA for drugs intended to treat rare diseases.

advanced melanoma in 2013.[69] Breakthrough therapy designation enables expedited clinical development, which in the case of pembrolizumab ultimately led to its accelerated approval in the U.S. in 2014.[70]

109. The FDA granted accelerated approval for pembrolizumab in 2014 through a single treatment arm (no placebo) and relied on non-randomized data based on the melanoma expansion cohorts of KEYNOTE-001. Critics noted that without a randomized control arm, it was harder to quantify the exact magnitude of benefit compared to older immunotherapies (like ipilimumab) until later randomized trials (KEYNOTE-006) were completed.[71]

110. The initial aims of the first cohorts (NSCLC and melanoma) in KEYNOTE-001 were not to directly test efficacy in advanced melanoma, but only to define dose-limiting toxicities, to characterize the pharmacokinetic properties, and to establish a recommended phase 2 dose for pembrolizumab in patients with advanced solid tumors. The KEYNOTE-001 study was not sufficiently powered to evaluate efficacy for advanced melanoma.

111. Multiple studies have consistently shown that standard chemotherapy showed better overall survival and treatment benefits compared to pembrolizumab. In the KEYNOTE-002 study, investigators could not establish a statistically significant finding of improvement of overall survival with pembrolizumab versus chemotherapy.[72]

112. A recent meta-analysis comparing the use of pembrolizumab with conventional

---

[69] Breakthrough therapy designation is granted by the FDA for drugs intended to treat a serious condition and for which preliminary clinical evidence has demonstrated improvement in a clinically significant endpoint over existing therapies.
[70] Accelerated approval is granted by the FDA for drugs that fill an unmet medical need for a serious or life-threatening disease or condition based on a surrogate endpoint that is reasonably likely to predict clinical benefit. It allows for earlier approval, enabling the drug to be provided to patients sooner than would otherwise be possible.
[71] Kang, et al. Pembrolizumab KEYNOTE-001: an adaptive study leading to accelerated approval for two indications and a companion diagnostic. *Ann. Onc*. 2017; 28 (6): 1388-1398.
[72] Hamid, O, et al. Final analysis of a randomized trial comparing pembrolizumab versus investigator-choice chemotherapy for ipilimumab-refractory advanced melanoma. *European Journal of Cancer* 2017; 86: 37-45.

chemotherapy drugs for the treatment of advanced forms of melanoma found there was insufficient data to confirm statistical efficacy significance of using pembrolizumab over chemotherapy for metastatic melanoma.[73] The authors found that when compared to chemotherapy versus an ICI like pembrolizumab, the chemotherapy showed greater benefits on 24-months overall survival (RR = 1.60; IC95 %: 1.29, 1.98; p < 0.0001).

113. They concluded that "[i]t is typically easy to find in the literature studies with immunotherapy that show its effectiveness when compared to placebo groups or other recent therapies, such as target therapy, which is limited to tumors with specific mutations. But it is hard to find evidence when immunotherapy confronts chemotherapy, that also shows great results worldwide in the treatment of cancer." The authors stated that rigorous randomized controlled trials are needed to show that pembrolizumab is more effective than standard chemotherapy for advanced melanoma.

114. The most recent meta-analysis of the available clinical studies to have evaluated using pembrolizumab in the neoadjuvant period also found that the rates of serious adverse events (including pembrolizumab) were much higher when used in the neoadjuvant period.[74] This suggested that any benefit from neoadjuvant use of pembrolizumab or other anti-PD-1 inhibitors were outweighed by the increased risks of serious adverse events occurring with neoadjuvant therapy.

115. In 2023, the Cochrane Review published their evaluation of the effects of multiple neoadjuvant treatments in adults with stage III or stage IV melanoma according to the seventh

---

[73] Gonçalves, V.D., et al. Chemotherapy in focus: A meta-analysis confronts immunotherapy in the treatment of advanced melanoma. *Crit. Rev. Oncol. Hematol*. 2021, 161, 103304.
[74] Mangla, A, et al. Neoadjuvant Dual Checkpoint Inhibitors vs Anti-PD1 Therapy in High-Risk Resectable Melanoma: A Pooled Analysis. *JAMA Oncol*. 2024;10(5):612-620.

edition American Joint Committee on Cancer staging system.[75] The authors systemically reviewed the randomized controlled trials of people with stage III and IV melanoma using neoadjuvant treatment strategies through 2021. The authors concluded that there was significant uncertainty if neoadjuvant treatment of stage III or IV melanoma with any ICIs, including pembrolizumab, would help people to live longer, or to have more time before the disease recurs. They were also uncertain if the benefits of neoadjuvant treatment outweighed the risk of adverse events.

116. Several studies have performed meta-analysis to evaluate the efficacy between the ICIs, including pembrolizumab, and have found that ipilimumab with or without nivolumab has better efficacy and tolerability for treating advanced melanoma.[76]

**(v) Increase in Adverse Events and Undisclosed Safety Signal Analysis**

117. Under FDA regulations, Defendant is required to fully disclose to the FDA all adverse event data received on Keytruda. Adverse drug events are important because drug companies are required to use them to assess causality and to identify safety signals.

118. Defendant's Keytruda adverse events are stored in its global safety database and are directly accessible to Defendant. Defendant failed to review and report to the FDA all serious cases of Keytruda-related myasthenia gravis, myositis, myocarditis, and AKI and deaths from these adverse events maintained in Defendant's adverse event databases and did not fully disclose its internal safety signal analysis of those serious adverse events to the FDA. The FDA maintains a publicly available adverse event reporting system (the FAERS database) that is known to

[75] McCullagh, GC, et al. Neoadjuvant treatment for stage III and IV cutaneous melanoma. *Cochrane Database of Systematic Reviews* 2023, Issue 1. Art. No.: CD012974.

[76] Alrabadi, et al. Systematic review and meta-analysis efficacy and safety of immune checkpoint inhibitors in advanced melanoma patients with anti-PD-1 progression: a systematic review and meta-analysis. *Clin Transl Oncol.* 2021 Sep;23(9):1885-1904.

Plaintiff's prescribing physician and discussed in the medical community. If Defendant had disclosed all Keytruda-related myasthenia gravis, myositis, myocarditis, and AKI adverse events to the FDA before Mr. Dombeck was prescribed Keytruda, Plaintiff's prescribing physician would have had access to that safety data and also been informed of those adverse events through continuing medical education conferences and scientific literature that would have reported on those adverse events and the increase in adverse events. Had Defendant made this safety information available to Mr. Dombeck's prescribing physician, he would not have prescribed Keytruda to Mr. Dombeck, and Mr. Dombeck would not have been injured and died.

119. In addition to failing to report all cases of myasthenia gravis, myositis, myocarditis, and AKI to the FDA, Defendant "soft coded"[77] relevant Keytruda adverse events (including cases of myasthenia gravis, myositis, myocarditis, AKI and deaths from these conditions) and failed to adequately track, analyze, and report safety signals that emerged from these adverse events to the FDA.

120. Defendant knew or should have known about an increase in the number of Keytruda myasthenia gravis, myositis, myocarditis, AKI and related death adverse events before Keytruda was prescribed to Mr. Dombeck. Defendant's failure to report such adverse events (including cases occurring in clinical trials), Defendant's soft coding of such adverse events as less severe medical events, and the known (to Defendant) increase in such adverse events constitute newly acquired safety information that Defendant should have but never disclosed to the FDA and Plaintiff's prescribing physician. A summary of relevant reporting numbers for Keytruda from the time of FDA approval through the end of 2023 (the year preceding Plaintiff's prescription) is included

[77] "Soft coding" occurs when a drug company, during the adverse event data entry process, selects a medical term to code the adverse event that is less severe than the correct adverse event term.

below:

- 52,032 total adverse event reports (over 11,000 of which were fatal);
- 845 myasthenia gravis adverse event reports (110 of which were fatal);
- 2,093 myocarditis adverse event reports (403 of which were fatal);
- 1,060 myositis adverse event reports (167 of which were fatal);
- 2,011 AKI adverse event reports (208 of which were fatal); and
- 285 renal failure adverse event reports (111 of which were fatal).

121. While the FDA was aware of myasthenia gravis, myositis, myocarditis, and AKI reports in connection with Keytruda, Defendant did not disclose to the FDA the true and increased frequency and severity of myasthenia gravis, myositis, myocarditis, AKI and related deaths or the results of its internal safety signal analysis of these adverse events. Further, Defendant withheld and delayed reporting serious, combined cases of myasthenia gravis, myositis, myocarditis (i.e., where the patient suffered all three medical events concurrently) to the FDA until some point after Plaintiff's prescription in 2024 and data dumped 98 serious combined MMM cases into FAERS in 2025 even though the majority of those cases were available to and should have been reported by Defendant before 2025. Merck's internal case narratives, coding choices, medical review determinations, aggregate analyses, timing analyses, disproportionality analyses, and fatality analyses were not available to prescribing physicians and were not fully and accurately submitted to the FDA before August 6, 2024. Those internal analyses constituted newly acquired information because they revealed a Keytruda-specific risk of early, severe, and fatal MMM/AKI of greater frequency and severity than was reflected in the U.S. label.

122. In addition to the increase in adverse events in the FAERS database, scientific papers (discussed above) also reported an increase in Keytruda adverse events. Defendant should

have but did not fully, timely and accurately disclose the increase in myasthenia gravis, myositis, myocarditis, AKI and related death adverse events to prescribing physicians and the FDA.

**(vi) Merck Changed the Keytruda Label to Warn for MMM After Mr. Dombeck's Death**

123. In May 2026, the FDA approved a revised Keytruda label. The May 2026 label identifies "Warnings and Precautions (5)" as a recent major change and adds, for the first time, the following warning in Section 5 of the label:

> Other: Myocarditis-Myositis-Myasthenia Gravis (or Myasthenia-Like) Overlap Syndrome, reported as the co-occurrence of either two or all three adverse reactions.

124. Mr. Dombeck suffered myositis, myocarditis and myositis—all three of the listed "M" conditions—and died from the very MMM overlap condition now listed in the new May 2026 Keytruda warning. The label change is not coincidental. It is a direct response to Plaintiff's claims in this case and prior lawsuits filed against Defendant.

**E. Mr. Dombeck's Prescribing Physician Relied on Defendant's Misleading Safety Information**

125. Due in part to the availability of multiple melanoma treatment strategies, Mr. Dombeck's prescribing physician assessed the risks and benefits of the use of various cancer treatments, including Keytruda, for Mr. Dombeck. In evaluating the appropriate drug or treatment therapy for Mr. Dombeck, Plaintiff's prescribing physician intended to select the drug or treatment option that would be the most tolerable for Mr. Dombeck, have the lowest potential for harm, and be most effective in treating his melanoma, which was not considered terminal at the time of treatment.

126. For the purpose of assessing the risks and benefits of prescribing Keytruda to Mr. Dombeck, among other Keytruda-related information, Plaintiff's prescribing physician relied on

his education, training and experience; the branded U.S. Keytruda label; Defendant's sponsored medical and pharmaceutical websites; continuing medical education conferences where Keytruda was discussed; Defendant's medical literature, sales efforts and advertisements on Keytruda; discussions with Defendant's sales representatives at the times they visited his office to sell and promote Keytruda; Dear Healthcare Professional (DHCP) letters and communications; and promotional materials provided by Defendant regarding Keytruda, among other documents and communications.

127. Defendant did not advise Plaintiff's prescribing physician of the increased risk of myasthenia gravis, myositis, myocarditis and AKI, the increased risk of fatality from such adverse events, or the increased risk of harm to Mr. Dombeck's subpopulations. Defendant did not disclose to Plaintiff's prescribing physician the increase in myasthenia gravis, myositis, myocarditis, and AKI adverse events, unreported cases of myasthenia gravis, myositis, myocarditis, and AKI (including those occurring in clinical trials), or Defendant's soft coding of Keytruda-related myasthenia gravis, myositis, myocarditis, and AKI adverse events.

128. In prescribing Keytruda to Mr. Dombeck, Plaintiff's prescribing physician relied on Defendant to accurately disclose myasthenia gravis, myositis, myocarditis, and AKI safety data regarding Keytruda. He was not aware of the inaccurate, false and misleading safety information described above, or Defendant's omission from and misrepresentations contained in the Keytruda label and prescribing information with regard to myasthenia gravis, myositis, myocarditis, AKI and the high risk of Keytruda-related deaths from those conditions. Plaintiff's prescribing physician would not have prescribed Keytruda to Mr. Dombeck if he had known of the material safety data and information described in this Complaint.

129. As an oncologist, Dr. Lutzky has the option to prescribe many different cancer

medications to his patients or no medication at all (*i.e.*, non-medication therapy). It is impractical to place the burden on or expect every physician to manage a medical practice, effectively treat their patients, and review all of the available safety literature regarding every drug that may be applicable to their practice. These obvious impracticalities are, in part, why federal regulations place the burden on drug companies such as Defendant to disclose all material safety information regarding the safe use of its drugs. Defendant knew it was its duty and legal responsibility to do so. It is Plaintiff's prescribing physician's practice to rely on safety information provided by drug companies like Defendant (including but not limited to prescribing information disseminated in labeling and Medication Guides, DHCP letters, sales representative detail information, sales literature and communications, symposiums and medical conferences), and he was exposed to, reviewed and relied upon the safety information referenced above when he was analyzing the safest and most effective cancer medication or therapy to use with Mr. Dombeck.

130. The omitted information was material because Mr. Dombeck's prescribing physician was not merely deciding whether Keytruda could be used in cancer patients generally. He was deciding whether Keytruda's benefits outweighed its risks for this specific 77-year-old patient with pre-existing cardiac and autoimmune/rheumatologic history, non-terminal disease, and available alternative treatment strategies. The Dombeck Warnings would have changed that patient-specific risk-benefit decision.

131. Had Defendant accurately disclosed the risk of myasthenia gravis, myositis, myocarditis, AKI, MMM/overlap syndrome, and the subpopulation risks above, Plaintiff's prescribing physician would not have prescribed Keytruda to Mr. Dombeck on the regimen used, would have prescribed a safer alternative melanoma treatment strategy, active surveillance, surgery, another systemic therapy, or no systemic therapy for Mr. Dombeck, and Mr. Dombeck

would not have died from a Keytruda-induced drug reaction.

132. But for the above actions and omissions of Defendant, Mr. Dombeck would not have suffered the catastrophic and fatal injuries giving rise to this case.

## IV. CAUSES OF ACTION[78]

### COUNT I - STRICT PRODUCTS LIABILITY/FAILURE TO WARN

133. Plaintiff incorporates by reference each and every paragraph of this Complaint as set forth in full herein.

134. Defendant is strictly liable for Plaintiff's injuries because (a) Keytruda was in a defective condition when it left Defendant's control such that it was unreasonably dangerous, and (b) the defective condition was a proximate cause of Plaintiff's injuries.

135. Defendant designed, tested, manufactured, marketed, distributed and supplied Keytruda. As such, Defendant had a duty to adequately study the product in conformance with the standards of care to ensure that the risks and benefits of the drug were sufficient for the safe and effective use of the drug for its approved indications, and to warn healthcare providers including Mr. Dombeck's physicians of the health risks and dangers associated with using the medication.

136. Keytruda was in the exclusive control of Defendant and was sold without adequate directions of use and without adequate warnings regarding the increased risks, incidences and frequencies of myasthenia gravis, myositis, myocarditis, AKI, subpopulation risks, and the increased risk of death from those conditions.

137. As a direct and proximate result of the wrongdoing and actions of Defendant as described herein, Mr. Dombeck suffered catastrophic and fatal injuries. As a result of Defendant's

---

[78] Plaintiff's claims in this case are limited to post-FDA approval claims that are primarily based on safety information that emerged after Keytruda's 2014 FDA approval. Plaintiff is not pursuing pre-FDA approval claims or bringing claims for fraud on the FDA.

wrongful actions, Plaintiff suffered injury and damages and as alleged herein.

138. Defendant knew of the defective nature of Keytruda, but continued to manufacture, market, and sell the medication to maximize sales and profits at the expense of public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by the medication, and in violation of their duty to provide accurate, adequate, and complete directions for use and warnings concerning the drug.

139. Defendant failed to warn Plaintiff's prescribing physician of the dangerous propensities of Keytruda, which were known or should have been known to Defendant, as they were scientifically readily available.

140. Defendant knew and intended for Keytruda to be prescribed by oncologists and to be used by persons with a prescription, without any inspection for defects. Defendant also knew that physicians would rely upon the representations made by Defendant in its applications/dossiers, product labels, patient information leaflets and medication guides, and in other promotional and sales materials upon which Plaintiff's prescribing physician did so rely.

141. As a direct and proximate result of Defendant's sale of Keytruda without adequate directions of use and adequate warnings regarding the increased risks, incidence and frequencies of myasthenia gravis, myositis, myocarditis, AKI, and subpopulation risks, Plaintiff suffered catastrophic and fatal injuries. As a result of Defendant's wrongful actions, Plaintiff suffered damages and harm as alleged herein.

**COUNT II - NEGLIGENCE**

142. Plaintiff incorporates by reference each and every paragraph of the Complaint as though set forth in full herein.

143. Defendant owed a duty to Plaintiff's prescribing physicians and Plaintiff to use

reasonable care in labeling, manufacturing, marketing, supplying, distributing and selling Keytruda, including a duty to ensure that Keytruda did not cause users to suffer from unreasonable and dangerous side effects. Further, Defendant at a minimum had a duty to conduct safety reviews of all clinical trial data, pharmacology and toxicology data, including published scientific literature, especially involving the increased risks to the elderly and other subpopulations identified above, and to conduct adequate post-approval review of safety data, including reviewing the post-marketing clinical studies, published literature, and global spontaneous reporting regarding the increased risks of myasthenia gravis, myositis, myocarditis, AKI, and subpopulation risks associated with Keytruda, and to update the Keytruda labeling with the essential scientific information for the safe and effective use of the drug. Defendant failed to exercise reasonable care and failed to warn of the known risks associated with Keytruda.

144. Keytruda lacked sufficient warnings regarding the hazards and dangers to users of Keytruda and failed to provide safeguards to prevent the injuries sustained by Plaintiff.

145. Defendant failed to properly analyze and report on the safety profile of Keytruda prior to its sale, and as a result, subjected users to an unreasonable risk of injury when those products were used as directed and breached their duty to conduct safety reviews of all clinical trial data, pharmacology and toxicology data, including published scientific literature.

146. In addition to those reasons set forth above, Defendant breached its duty and was negligent in its actions, misrepresentations, and omissions towards Plaintiff in the following ways:

a. Failed to exercise due care in developing, marketing labeling and manufacturing Keytruda;

b. Failed to include adequate directions for use and warnings with Keytruda to alert prescribers of its risks and side effects;

c. Failed to adequately warn Plaintiff's prescribing physician regarding the

increased risks of myasthenia gravis, myositis, myocarditis, AKI and the increased risk of death related to those conditions, especially in the elderly and pre-existing medical condition subpopulations identified above;

d. Failed to conduct adequate pharmacovigilance and prepare a risk management assessment and pharmacovigilance plan to mitigate the increased risks of myasthenia gravis, myositis, myocarditis, AKI and subpopulation risks;

e. Failed to warn through various communication vehicles, including patient information leaflets or patient medication guides, DHCP letters, press releases, and other risk communications;

f. Failed to provide adequate post-marketing warning or instructions after Defendant knew or should have known of the significant risks identified herein;

g. Placed an unsafe product into the stream of commerce; and

h. Was otherwise careless or negligent.

147. Defendant knew or should have known that Keytruda caused unreasonably dangerous risks and serious side effects of which Plaintiff's prescribing physician would not be aware. Defendant nevertheless advertised, marketed, sold, and distributed Keytruda, despite knowing of its unreasonable risks of injury.

148. Defendant knew or should have known that consumers such as Mr. Dombeck would suffer injury and death as a result of Defendant's failure to exercise reasonable care as described above.

149. Defendant knew or should have known of the defective nature of Keytruda, as set forth herein, but continued to manufacture, market, and sell Keytruda so as to maximize sales and profits at the expense of the health and safety of the public, in conscious disregard of the foreseeable harm caused by the drug. Defendant had actual knowledge that its actions were dangerous, and Defendant failed to remedy its wrongful conduct in order to protect its own financial interests. Defendant's conduct as set forth herein was grossly negligent in that it was so

reckless, willful and wanting in care that it constituted a conscious disregard and reckless indifference to the life, safety and rights of individuals exposed to the conduct, including Plaintiff.

150. Defendant knew about and failed to disclose to Plaintiff's prescribing physician material safety facts known or available to Defendant in order to ensure continued and increased sales of Keytruda. The failure to disclose this critical safety information to Plaintiff's prescribing physician deprived him and Mr. Dombeck of the information necessary for Mr. Dombeck and Plaintiff's prescribing physician to weigh the true risks of taking Keytruda against the benefits. As a result of Defendant's wrongful actions, Plaintiff suffered damages and harm as alleged herein.

## DEMAND FOR JURY TRIAL

151. Plaintiff demands a jury trial on all counts in this Complaint.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment and relief as follows:

1. Actual and compensatory damages, including but not limited to past medical costs;

2. Past and future non-economic damages, including but not limited to all wrongful death and survival damages available in the past and future under the Florida Wrongful Death Act, such as past and future physical and mental pain and suffering, loss of support and services, loss of care, comfort, spousal companionship and society, and loss of net estate accumulations;

3. Punitive damages; and

4. Pre-and post-judgment interest.

DATED: August 18, 2026

By: */s/ Elizabeth Zwibel*
Elizabeth Zwibel
Florida Bar No. 0193046
liz@eazlaw.com
teamliz@eazlaw.com
**ELIZABETH ZWIBEL LAW**
Mailing Address: 652 Nina Drive

St. Petersburg, FL 33715
Phone: (844) 549-9467

Connor G. Sheehan*
Texas Bar No. 24046827
csheehan@dunnsheehan.com
**DUNN SHEEHAN LLP**
5910 N Central Expressway, Suite 1310
Dallas, Texas 75206
Phone: (214) 855-0077
Fax: (214) 866-0070
**Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR PLAINTIFF**